FILED
CLERK, U.S. DISTRICT COURT

JUL - 1 2011

CENTRAL DISTRICT OF CALIFORNIA
BY                            DEPUTY

1    Barrett S. Litt, SBN 45527
     E-Mail: blitt@littlaw.com
2    Lindsay B. Battles, SBN 262862
3    LITT, ESTUAR, & KITSON, LLP
     1055 Wilshire Boulevard, Suite 1880
4    Los Angeles, California 90017
5    Telephone: (213) 386-3114
     Facsimile: (213) 380-4585
6

7    Gregory Yates, SBN 63259
     Email: gyates@gregoryayates.net
8    Karen Bavilski, SBN 201699
9    LAW OFFICES OF GREGORY A. YATES
     16830 Ventura Boulevard, #250
10   Encino, California 91436
     Telephone: (310) 858-6944
11   Facsimile: (818) 905-7038

12

13   Attorneys for Plaintiff
     JAMES SHORTT

14

15              UNITED STATES DISTRICT COURT

16              CENTRAL DISTRICT OF CALIFORNIA

17   JAMES SHORTT,                 COMPLAINT FOR DAMAGES

18              Plaintiff,         LACV11-5484RSWL(JCGx)
                                   (1) DEPRIVATION OF CIVIL RIGHTS,
19                                     42 U.S.C. §1983, DELIBERATE
20          vs.                        FABRICATION OF EVIDENCE
                                       (Against Defendants Lamascus and
21   COUNTY OF LOS ANGELES,            Mercer),
     RICHARD LAMASCUS,             (2) DEPRIVATION OF CIVIL RIGHTS,
22   JAMES MERCER, AND DOES            42 U.S.C. §1983, *MONELL*
23   1-10.                             VIOLATIONS, FABRICATION OF
                                       EVIDENCE (Against the County of
24              Defendants.            Los Angeles Sheriff's Department
25                                     and County of Los Angeles District
26                                     Attorney's Office)

27                                 DEMAND FOR JURY TRIAL.
28

# I.

## JURISDICTION AND VENUE

1.     This action is brought by Plaintiff James Darrell Short (hereafter "Plaintiff" or "Shortt") pursuant to 42 U.S.C. §1983.

2.     This Court has jurisdiction under 28 U.S.C. §1343(4) for violations of the 1871 Civil Rights Enforcement Act, as amended, including 42 U.S.C. §1983, and under 28 U.S.C. §1331.

3.     The acts and omissions complained of  herein commenced on February 23, 1981 and continued until January 19, 2010, within the Central District of California. Therefore, venue lies in this District pursuant to 28 U.S.C. §1391.

# II.

## INTRODUCTION

4.     On July 15, 1982, James Darrell Shortt was sentenced to life in prison without the possibility of parole for a murder that he did not commit. His conviction hinged on the testimony of a notorious jailhouse informant, Stephen Cisneros, who falsely testified that he overheard Mr. Shortt confess to killing the victim. Without Mr. Cisneros's testimony, Mr. Shortt could not have been convicted because the evidence against him consisted almost exclusively of uncorroborated accomplice testimony. In May 17, 1990, Mr. Cisneros revealed that the "confession" was entirely fabricated and that Mr. Shortt never admitted responsibility for the murder.

5.     LASD homicide detectives knew the confession testimony was false and directly participated in fabricating the confession. When detectives met with Mr. Cisneros, he informed them of what he actually overheard, which included no incriminating statements on Mr. Shortt's behalf. The detectives advised Mr. Cisneros that they believed Mr. Shortt was guilty and instructed him to testify consistent with their theory, regardless of what Mr. Cisneros actually heard.

6.     Mr. Cisneros offered the fabricated testimony in exchange for remarkably lenient sentencing on his own pending rape charges. These benefits were known to prosecutors but not disclosed to Mr. Shortt's defense attorneys, even after Mr. Cisneros lied under oath about whether he was receiving anything in exchange for his testimony.

7.     Mr. Shortt served 28 years in custody for a murder of which he has never been lawfully convicted, and the commission of which he has adamantly denied since his arrest in 1981. For large periods of his incarceration, Mr. Shortt was assigned to maximum security prisons where he suffered the unimaginable and inescapable horrors endemic to such facilities.

8.     Mr. Shortt filed numerous appeals and petitions for habeas relief. On October 16, 2009, the Ninth Circuit overturned Mr. Shortt's conviction on the basis that material, exculpatory information concerning Mr. Cisneros not been disclosed. *See Shortt v. Roe*, 342 F. App'x. 331, 332 (9th Cir. 2009) ("the state failed to disclose that Cisneros had been given sentencing consideration in exchange for his testimony against Shortt, and then failed to correct or disclose Cisneros' perjurious testimony regarding consideration received for his cooperation and testimony").

9.     In January 2010, the criminal case was re-tried without Mr. Cisneros's fabricated confession testimony. Plaintiff was acquitted by a jury on January 19, 2010 (*People v. James Darrell Shortt*; Case No.: XSEA4511256-03).

### III.

### PARTIES

10.    Plaintiff James Shortt is a resident of the State of California and resided within the jurisdiction of the State of California at all times herein alleged.

11.    Defendant County of Los Angeles is, and at all times herein alleged was, a municipal corporation or political subdivision organized and existing under the laws of the State of California. The Los Angeles County Sheriff's Department is, and at all times herein alleged was, an agency of the County of Los Angeles.

2

The Los Angeles County District Attorneys Office is, and at all times herein alleged was, an agency of the County of Los Angeles.

12.    On information and belief, Defendant Richard Lamascus is a resident of the state of California. At times relevant herein, Defendant Lamascus was an employee of Los Angeles County, working for the Los Angeles Sheriff's Department, and a resident of the State of California.

13.    On information and belief, Defendant James Mercer is a resident of the state of California. At times relevant herein, Defendant Mercer was an employee of Los Angeles County, working for the Los Angeles Sheriff's Department, and a resident of the State of California.

14.    The true names and capacities of Defendants DOES 1 through 10, inclusive, are presently unknown to Plaintiff, who therefore sues said Defendants by such fictitious names.  Plaintiff will amend this complaint to set forth the true names and capacities of said Defendants when he has ascertained them.  Plaintiff is further informed and believes, and upon such information and belief alleges, that each of the fictitiously named Defendants aided and assisted the named Defendants in committing the wrongful acts alleged herein, and that the damages he has sustained, as alleged herein, were proximately caused by such Defendants.

## IV.

## GENERAL ALLEGATIONS

15.   Plaintiff is informed and believes, and thereon alleges that, at all times herein mentioned, each Defendant was the agent and/or employee and/or co-conspirator of each remaining Defendant, and in doing the things hereinafter alleged, was acting within the scope of such agency, employment and/or conspiracy, and with the permission and consent of other co-Defendants.

16.   Each paragraph of this complaint is expressly incorporated into each cause of action which is a part of this complaint.

17. The acts and omissions of all Defendants were engaged in maliciously, callously, oppressively, wantonly, recklessly, and with deliberate indifference to the rights of Plaintiff.

**V.**

**FACTUAL ALLEGATIONS**

**A.   The Murder of Jesus Riso**

18. On August 6, 1980, at approximately 10:00 p.m., the body of Jesus Riso was dumped on the sidewalk in front of 5222 Filmore Street in the City of Bell. Mr. Riso died from a gunshot wound to the head. When police found his body, his pockets were turned out and his wallet was missing. His wife later confirmed that he had left the house with $400.00, which was missing when police found his body.

19. Investigators learned that Mr. Riso had been drinking at the "Five O'Clock Club," which is around the corner from where police found his body. Mr. Riso left the bar in the company of a woman, subsequently identified as criminal trial co-defendant Katherine Lee Weathers.

20. The woman who resided at 5222 Filmore, Katherine Seelinger, told police that she had seen a van in front of her home shortly before the body was discovered. From inside her home, she observed a man exit the front passenger door and open the sliding cargo door from the outside. She subsequently identified this man as criminal trial co-defendant, Vincent Frangello.

21. Initially, investigators knew very little beyond what Seelinger and a bartender had told them: that a woman lured Mr. Riso out of a bar, that he was robbed, that a van was involved, and at least one man helped dispose of the body.

22. The crime remained unsolved for six months until an anonymous tip led investigators to criminal trial co-defendant Weathers, who was in Sheriff's custody for public intoxication. LASD homicide detectives Lamascus and Mercer were assigned to handle the case.

4

**B.**   **The Pre-Arrest Investigation: Co-Defendants Katherine Weathers and Vincent Frangello Blamed James Shortt for the Murder**

23.    On February 21, 1981, Detectives Lamascus and Mercer interviewed Katherine Weathers in custody. Weathers told Lamascus and Mercer that she, Vincent Frangello and Mr. Shortt agreed to commit a robbery, and that Mr. Riso was shot during the commission of the robbery. The idea to commit this robbery was hers.

24.     According to Weathers, the agreed-upon plan was for her to go into a bar and lure a man outside so that he could be robbed by Mr. Shortt. Ms. Weathers executed her part of the plan. After she lured Mr. Riso outside the bar, she opened the door of the van so he could get in. Mr. Riso was murdered in the van.

25.    During the interview, Weathers insisted that she and Frangello had only agreed to commit a robbery, not to commit a murder. She also insisted that she did not know Mr. Shortt had a gun and was planning to pull it on the victim. During Weathers's recorded statement, however, she initially told detectives that *she* pulled the gun. She then changed her statement, and told police that Mr. Shortt pulled the gun and shot Mr. Riso.

26.    On February 22, 1981, based on information obtained from Weathers, police arrested Frangello and seized his van, which had been used in the crime. After Lamascus and Mercer advised Frangello of the substance of Weathers's interview, Frangello admitted his involvement in the murder as well. Like Weathers, Frangello insisted that he agreed to participate only in a robbery, not a murder. And like Weathers, he claimed that Mr. Shortt personally pulled the trigger, shooting Mr. Riso in the head. Frangello admitted to his role in the disposing of Mr. Riso's body on the sidewalk.

27.    Frangello and Weathers had strong motives to lie. It was certainly foreseeable that they would try to shift the blame to someone else. Both had admitted to more than sufficient facts to be prosecuted for murder and robbery.

5

Indeed, Weathers had admitted that the robbery was her idea, and had even told police in a tape-recorded statement that she pulled the gun on the victim. Frangello had given a similarly devastating confession, and had been identified by an independent witness as the person who pulled Mr. Riso's body out of the van and dumped it in the street.

28.     Not only did Frangello and Weathers have compelling reasons to lie, they also had more than sufficient opportunity to coordinate their stories. At the time of the murder, Weathers and Frangello were romantically involved. They lived together with Weathers's brother, Jim Sult, and Sult's girlfriend, Karen Dunn. After the murder, Weathers, Frangello, Sult and Dunn continued to live together in Frangello's house as they had been doing. None of these four regularly interacted with Mr. Shortt.

29.     Mr. Shortt was arrested the following day, February 23, 1981, at the home he shared with his wife. At the time of Mr. Shortt's arrest, police investigators recovered several rounds of .25 caliber ammunition. The ammunition was of the same manufacture as that used in the crime.

30.     Weathers, Frangello, and Shortt were charged with murder. Shortt was charged with personally using a firearm within the meaning of Penal Code §§122022.5 and 1203.06.

31.     Although the prosecution was prepared to give Frangello and Weathers immunity to secure their testimony against Shortt, there remained the obvious problem of corroborating their intrinsically suspect statements. Beyond the ammunition, which was never directly linked to the murder, investigators found no physical or forensic evidence against Mr. Shortt, including no fingerprints, DNA, hair samples, fibers, bloody footprints or handprints.

**C.     The Use of the False Confession Through the Notorious Jailhouse Informant, Stephen Cisneros**

32.     As Tom Romeyn, the prosecutor handling the case, acknowledged, the only independently sufficient corroboration of the accomplice testimony was the testimony of notorious jailhouse informant, Stephen Cisneros.

33.     Stephen Cisneros was arrested on February 23, 1981 for assault to commit rape, grand theft auto, and aggravated assault.  At that time, he was also on probation after being convicted of assault with the intent to commit rape. Because Mr. Cisneros had picked up a new assault with intent to commit rape charge while he was on active probation for the same crime, and because he had two prior felony convictions, he knew he was facing significant time in prison. In fact, he knew that he could be sentenced to at least twelve years in prison – six years for his pending assault with intent to commit rape case, and six fully consecutive years for the probation violation in his prior §220 case.

34.     While in custody on March 10, 1981 at the Los Angeles County Jail, Mr. Cisneros was placed on a Los Angeles County Sheriff's Department bus and transported to Huntington Park Municipal Court.  Mr. Cisneros did not have a court appearance scheduled that day.  He knew that when an inmate at the Los Angeles County Jail is placed on a bus to go to court, despite having no scheduled court appearance, law enforcement is placing the inmate on the bus for the specific purpose of listening in on conversations of other inmates on the bus.  Jailhouse informants referred to this as a "dry run."

35.     James Shortt, Katherine Weathers and Vincent Frangello were also present on the bus with Mr. Cisneros.  During the entire bus ride, the only thing Mr. Cisneros heard Mr. Shortt say was, "Shut up."  Mr. Cisneros was never involved in a conversation with Mr. Shortt, Weathers or Frangello.

36.     Just days after the bus ride, Mr. Cisneros was interviewed by LASD homicide detectives. On information and belief, the detectives who interviewed Mr. Cisneros were Detectives Lamascus and Mercer.

37.     During the interview, the detectives showed Mr. Cisneros the Murder Book for the case involving Mr. Shortt, and reviewed it with Mr. Cisneros page by page while telling him how the crime occurred. The detectives told Mr. Cisneros that Weathers lured the victim to Mr. Shortt, and that Mr. Shortt killed him. Cisneros told the detectives that on the bus ride the day prior, Mr. Shortt didn't say anything other than for the other two (Weathers and Frangello) to "shut up."  Mr. Cisneros also told them that Mr. Shortt did not say anything that would implicate him as the murderer.

38.     During the meeting, the detectives gave Mr. Cisneros specific instructions to falsely testify. They told him to say that he asked Mr. Shortt on the bus ride, "Why did you kill him," and that Mr. Shortt answered, "I had to.  I couldn't leave any witnesses."  The detectives told Mr. Cisneros that, if he testified as they told him to, he would be sentenced to the low-base term of two years on his new case, and that he would receive the low-base term of two years on his probation violation.  They promised Mr. Cisneros that the sentences would run concurrently.  Mr. Cisneros agreed to testify as they requested.

39.     LASD detectives visited Mr. Cisneros as many as 5 more times before Mr. Shortt's criminal trial. During each visit, they reviewed the murder book page-by-page, prepping Mr. Cisneros on the facts of the case.

40.     In 1991, Cisneros admitted that Mr. Shortt did not make the statements attributed to him by Mr. Cisneros. He fabricated the false confession at the direction of, and with the assistance of, LASD homicide investigators who provided him with information about the case, and instructed him on what to say. Mr. Shortt's defense attorney was never apprised that Detectives Lamascus and Mercer provided Mr. Cisneros with confidential investigation information that could be used to concoct a false confession. Defendants never advised Mr. Shortt's defense attorney of the multiple "prep sessions" between LASD detectives and Mr. Cisneros.

8

**D.   Mr. Cisneros Received Substantial Sentencing Consideration in Exchange for His Testimony, Which He Denied Under Oath and Which Was Not Disclosed to Shortt's Defense**

41.   After Mr. Cisneros' first meeting with the detectives, they visited him several times before Mr. Shortt's criminal trial.  During the second or third visit, they were accompanied by Los Angeles County Deputy District Attorney, Tom Gray.  Mr. Gray told Mr. Cisneros that, if he testified as indicated above, he would get the deal promised him by the detectives.  Deputy D.A. Gray directed Mr. Cisneros to testify that the reason that he was getting the low base term on his case had nothing to do with his testimony.

42.   At trial, Mr. Cisneros committed perjury when he testified that his two year sentence on his pending case was not in exchange for his testimony against Mr. Shortt. He was asked under oath by Deputy District Attorney Tom Gray, and again on cross-examination, whether it was his understanding that he got no consideration or deals in exchange for his cooperation. Mr. Cisneros lied and testified that yes, that was his understanding.

43.   In his final argument, trial prosecutor Tom Gray emphasized Cisneros's testimony and vouched for his credibility as follows:

> "…Cisneros? He is called because he overheard a statement on the bus. You have the statement. It was *an admission by Shortt that Shortt killed the guy* because he didn't want any witnesses. It was in a conversation between Weathers and Shortt.
>
> Cisneros has been convicted of several felonies, including several serious felonies. If you choose not to believe him in his testimony here, it doesn't take away at all from the rest of the People's case. *I think that the evidence shows his statement is believable*. It is consistent with everything else. In effect, *that statement also*

*corroborates the accomplice testimony naming Mr. Shortt as the actual killer in this case*."

44.     Deputy D.A. Tom Gray further noted that the '*only credibility evidence presented against Cisneros was his 'prior felony convictions.'*

45.     As promised, the day after he completed his testimony, Mr. Cisneros was sentenced to two years in state prison with concurrent time for the probation violation. The prison sentence was a mere formality.  Mr. Cisneros remained at the Los Angeles County Jail until June 17, 1982, when he was specially transported by the Los Angeles County District Attorney's Investigators to Chino Prison.  About a week later, he was paroled and released from prison.

46.     The prosecution failed to disclose that Mr. Cisneros had been given substantial sentencing consideration in exchange for his testimony against Mr. Shortt. The plea agreement was, in fact, memorialized in an Advisement of Rights and Waiver form executed in court on August 10, 1981, ten months before Mr. Cisneros testified in Mr. Shortt's trial. Deputy Gray has acknowledged in a document entitled "Confidential Memo: DDA's Only" that Cisneros got "<u>more</u> than ample reward for his help. His two cases are very aggravated." In 1989, the D.A.'s Office formally admitted that Cisneros's sentence was predicated on his cooperation in the Shortt case.

47.     Cisneros's deal was not the only information prosecutors failed to disclose. Beyond sentencing consideration, the prosecution also failed to disclose psychiatric testimony, a psychiatric report, and two probation reports negatively reflecting on Cisneros's credibility.

E.   **Cisneros's False Confession Testimony Supplied the Only Meaningful Corroboration of the Accomplice Testimony**

48.     But for the crucial and devastating testimony of Mr. Cisneros, Mr. Shortt would have been granted a judgment of acquittal under Penal Code §1118.1 ("A conviction can not be had upon the testimony of an accomplice unless it be

corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.").

### 1.  Karen Dunn's Testimony

49.    Other than Cisneros, detectives located only one witness who supplied potentially meaningful corroboration of the accomplice testimony: Karen Dunn. By the time the case went to trial, however, Karen Dunn had twice recanted her testimony against Shortt. Dunn's testimony was patently unreliable, leaving prosecutors with Cisneros to provide the only "credible" corroboration of the accomplice testimony.

50.    Before the preliminary hearing, Karen Dunn was interviewed by LASD investigators, in the presence of her boyfriend Jim Sult, who was also Weathers's brother. During the interview, Dunn told investigators that, on the night of the murder, Jim Shortt was hosting a birthday party for her at his house. At some point during the evening, Mr. Shortt came into the bathroom with blood on his hands, washed it off in the sink, laughed and said "That's just one less Mexican."

51.    Later, Dunn came into the D.A.'s office and told them that she had lied about everything in her earlier interview, including the blood on Mr. Shortt's hands and the statement about "one less Mexican." Neither of these things was true. Dunn even admitted to the D.A.'s office that her boyfriend, Jim Sult, pressured her to feed the police false statements because he wanted to help his sister. The truth was that she had seen Shortt that night, but had not seen blood on his hands. She had not heard him say "That's one less Mexican." Dunn also explained that, when she first talked to police, she knew that Weathers was charged with murder, and thought she was helping Weathers by what she told them. In fact, "everyone" from Bell Gardens had told her the things to say. At a subsequent interview at the D.A.'s office, Dunn reiterated that her initial

statements regarding Shortt having blood on his hands and the comment about "one less Mexican" were untrue, that she had lied, and that she had only made the statements because her brother pressured her to do so.

52.     At trial, Karen Dunn testified consistent with her first statements to detectives. However, the jury was informed that she had retracted these statements and had twice admitted to prosecutors that her boyfriend, Jim Sult, pressured her to blame the murder on Mr. Shortt to protect Katherine Weathers.

53.     The prosecution's other key witnesses were Katherine Weathers, Vincent Frangello and Jim Sult. Katherine Weathers testified as anticipated. Jim Sult and Vincent Frangello did not testify as expected. In fact, both took the stand and made statements that, at a minimum, cast serious doubt on the truthfulness of their testimony against Mr. Shortt (discussed in the next two sections).

## 2.     Vincent Frangello's Testimony

54.     On the first day of Frangello's testimony, he recounted what he and Weathers told investigators (i.e., that Mr. Shortt had personally shot Mr. Riso). When Frangello took the stand the next day, however, he recanted: "yesterday when I testified, I wasn't of my own being and everything I said was a lie." His lawyer, standing next to him at the time, requested a recess. During the recess, his lawyer told him that, if he didn't continue with his testimony, his deal would be off, and that he would go to trial himself on the original murder and robbery charges. When he resumed the stand a third time, he claimed that he hadn't wanted to be a snitch, but then proceeded to testify as he had on the first day. The recantation, although temporary, was devastating to the reliability of his testimony.

## 3.     Jim Sult's Testimony

55.     Jim Sult was also expected to corroborate the accomplice testimony as he had done during the preliminary hearing. Unlike Dunn, his corroboration was based primarily on hearsay statements from Frangello and Weathers. At no point

did Jim Sult testify that he observed blood on Jim Shortt's hands, nor did Jim Sult testify to having heard Jim Shortt make incriminating statements.

56.     While Jim Sult did not recant, his credibility was put into question when he refused to take the oath at trial. Mr. Sult told the Court he could not testify for fear of being prosecuted for perjury. Instead of compelling his testimony, the judge declared him unavailable and allowed the prosecution to read his testimony from the preliminary hearing.

57.     At the preliminary hearing, Sult testified that he attended the party on August 5, 1980. His sister, Katherine Weathers, left the party for some time. When she returned, she appeared to be "all shook up" and requested to leave the party. He went outside and saw Frangello cutting out the carpet in the back of his van. He saw a puddle of blood on the carpet. Mr. Shortt came out of the house and told Sult not to say anything about what he had seen. Sult helped clean out the van by throwing the carpet away. Later, he saw Frangello scraping the wood flooring of the van with a knife. Later that night, Sult, Dunn, Weathers and Frangello got back together at Frangello's house. He claimed that Weathers and Frangello told him that Jim Shortt had shot the victim.

58.     Jim Sult's potential involvement in the crime was so apparent that the judge instructed the jury, pursuant to CALJIC 3.19, regarding the possibility that Sult was an accomplice.

**F.     The Los Angeles County District Attorney's Office Had Policies, Customs and Practices That Resulted In the Presentation of False Informant Evidence and the Withholding of Exculpatory Evidence**

59.     In 1972, approximately nine years prior to Mr. Shortt's arrest, the United States Supreme Court decided *Giglio v. United States*, 405 U.S. 150, 154 (1972). In that decision, the court held that:

"The prosecutor's office is an entity and as such it is the spokesman for the Government. A promise made by one attorney [to an informant

witness] must be attributed, for these purposes, to the Government. [citation omitted]. To the extent this places a burden on the large prosecution offices, procedures and regulations can be established to carry that burden and to insure communication of all relevant information on each case to every lawyer who deals with it."

60.     Prior, during, and subsequent to the prosecution of Mr. Shortt, the Los Angeles District Attorney's Office knew of abuses concerning jailhouse informants and of its own failure to record or disseminate that knowledge.

61.     In the late 1970's, prior to Mr. Shortt's arrest, two prosecutorial agencies conducted inquiries into claims by a jailhouse informant that he knew of improper conduct by Los Angeles County District Attorney's Office personnel with regard to confessions allegedly made to a jailhouse informant. The record of the informant's activities, and the conclusion of the inquires was never indexed or widely distributed within the Los Angeles County District Attorney's Office. Subsequently, the informant surfaced repeatedly as a witness in criminal trials.

62.     On information and belief, in January of 1979, prior to Mr. Shortt's trial, the Los Angeles County District Attorney's Office received letters from a jailhouse informant alleging that the informant and another informant provided false information in several criminal cases. This information was never indexed or widely distributed within the Los Angeles County District Attorney's Office.

63.     Despite the mandate by the United States Supreme Court in *Giglio v. United States*, 405 U.S.150 (1972), in conjunction with the pervasive use of jailhouse informants within the County of Los Angeles and substantial notice that false testimony by informants had occurred repeatedly within the County of Los Angeles, the Los Angeles District Attorney's Office purposefully, or with deliberate indifference to the constitutional rights of criminal defendants, failed to create any system for Deputy District Attorneys handling criminal cases to access

information pertaining to the benefits provided to jailhouse informants and other impeachment information.

64.     On information and belief, prior to the prosecution of Mr. Shortt, the Los Angeles County District Attorney's Office was aware that police officers and Deputy District Attorneys were providing case information orally and in writing to informants to make sure the informants knew the facts of the offense the criminal defendant was charged with  Nonetheless, such witnesses were routinely used in prosecutions without any system of determining the truthfulness of their testimony.

65.     On information and belief, prior to the prosecution of Mr. Shortt, the Los Angeles County District Attorney's Office considered the creation of a system to track benefits provided to jailhouse informants and other impeachment information. No such system was instituted. In 1985, one Deputy District Attorney informed the Los Angeles County District Attorney's Investigative Bureau that jailhouse informant Leslie White had a reputation for unreliability, yet there was no investigation and no efforts to record or disseminate this information.

66.     In 1986, a private investigator wrote a letter to representatives of the Los Angeles County District Attorney's Office addressing the issue of jailhouse informants being supplied copies of arrest reports and given prep sessions by investigators and prosecutors to make sure that the jailhouse informants knew what defendants had supposedly confessed to. The private investigator asserted that an investigation should be conducted. He received no response.

67.     On October 9, 1986, the Head Deputy of the Torrance branch of the Los Angeles County District Attorney's Office, Peter Berman, wrote to the Chief Deputy, Gilbert Garcetti, and to Director, Bureau, Branch and Area Operations, Denis K. Petty, discussing the lack of accountability and lack of accurate information concerning jailhouse informants in the Los Angles County District Attorney's Office, and the need for a standardized central index. The proposal was that, through this index, every Deputy District Attorney should be required to log

basic information in a standardized manner to give other Deputy District Attorneys access to jailhouse informant information.

68.     On January 27, 1987, the Management Staff of the Los Angeles County District Attorney's Office met to discuss the creation of a central index reflecting jailhouse informants. The Management Staff of the Los Angeles County District Attorney's Office decided not to create a central index for informants. The reasons given were: a) the defense bar would find out about the informant's records which would be used to impeach the informant's credibility; and b) the Management Staff suspected that deputies from the Los Angeles County Sheriff's Department intentionally put jailhouse informants in jail cells with defendants from where law enforcement could use a confession. The Management Staff believed that deputies from the Los Angeles County Sheriff's Department would be charged with knowledge of the information in centralized records and, therefore, the future conduct of the jailhouse informant in obtaining confessions would be construed as possibly violating *Massiah v. United States*, 377 U.S. 201 (1964).

69.     On October 24, 1988, informant Leslie White publicly demonstrated the methods jailhouse informants used to discover case information and to fabricate suspects' confessions.

70.     On November 17, 1988, Chief Deputy District Attorney Gregory Thompson disseminated an order to all Criminal Deputy District Attorneys entitled Special Directive 88-14 stating:

"We must eliminate from the People's case the risk of perjured testimony by a jailhouse informant. That threat is most acute when the indication of the informant's reliability is solely that "he relates facts which are known to law enforcement, but could not otherwise be known by him." That factor of reliability has been shown not to be dependable in all cases…This office will no longer call as a witness a jailhouse informant to testify to a defendant's

oral statement, admission or confession without concrete evidence of the truthfulness of the informant. Even then, prior approval by the appropriate Bureau Director must be obtained."

71.    On June 1, 1989, Chief Deputy District Attorney Gregory Thompson disseminated another order to all Criminal Deputy District Attorneys entitled Special Directive 89-05 outlining the responsibilities of Deputy District Attorneys regarding jailhouse informants. In that order, Chief Deputy Thompson states that the Los Angeles County District Attorney will: establish a central jailhouse index to be maintained in the Bureau of Special Operations. This Central Index is available and indeed must be consulted by any attorney who wants to use a jailhouse informant as a witness.

72.    In 1989-1990, the Los Angeles County Grand Jury reviewed evidence that the Los Angeles County District Attorney's Office, and law enforcement throughout Southern California, were in the practice of using jailhouse informants to obtain false and fabricated confessions of criminal defendants. The pervasive use of the jailhouse informants put in doubt many of the convictions obtained by the Los Angeles County District Attorney's Office. The period of inquiry by the Grand Jury spans from approximately 1979 to 1990, although there are references to convictions as early as 1976.

73. In its findings in the *Report of the 1989-1990 Los Angeles County Grand Jury In Its Investigation of the Involvement of Jail House Informants in the Criminal Justice System in the Los Angeles County*, the Grand Jury found that the Los Angeles County District Attorney's Office failed in its responsibilities by its "deliberate and informed declination to take the action necessary to curtail the misuse of jailhouse informant testimony." Among the statements made by the Grand Jury are the following:

   a.  By definition, jail house informants have been deprived of a substantial and cherished right -- their liberty, their freedom. Because of the serious

nature of the charges pending against informants, and their history of recidivism, informants often face potentially lengthy prison terms. As such, these individuals are highly motivated to curry favor with the authorities perceived to have control over their destiny. The myriad benefits and favored treatment which are potentially available to informants are compelling incentives for them to offer testimony and also a strong motivation to fabricate, when necessary, in order to provide such testimony. This premise is a basic concept to the understanding of the jail house informant phenomena. The courts have sometimes lacked adequate factual information to fully realize the potential for untrustworthiness which is inherent in such testimony because of the strong inducements to lie or shape testimony in favor of the prosecution.

b. Jail house informants want some benefit in return for providing testimony. The more sophisticated may attribute their willingness to testify for law enforcement to other motives, such as their repugnance toward the particular crime charged, a family member having been a victim of a similar occurrence, the lack of remorse shown by the defendant, or other explanation to account for their assistance to law enforcement. Nevertheless, in the vast majority of cases it is a benefit, real or perceived, for the informant or some third party that motivates the cooperation.

c. Informants testified before the Grand Jury to repeated instances of perjury and providing false information to law enforcement. With one exception, each informant who testified claimed he himself had committed perjury or provided false information incriminating another inmate one or more times.

d. An appalling number of instances of perjury or other falsifications to law enforcement during the past ten years were described by informants.

Undeniably, a significant number of informants do not tend to feel constrained by external or internal values to refrain from lying, regardless of the consequences to other inmates.

e.  The methods used by informants to acquire information about another defendant's case are numerous. The following are allegations made by informants concerning ways they obtain information on cases:

f.  Law enforcement officials assigned to a case, including Deputy District Attorneys, supply information on their case to informants.

74.     After the 1972 *Giglio* decision, the Los Angeles County District Attorney's Office had an administrative duty to create a system in which information pertaining to jailhouse informants would be disseminated to the Deputy District Attorneys representing the County during Mr. Shortt's preliminary hearing and trial. Based on the administrative actions by the County of Los Angles District Attorney's office, Deputy District Attorneys, including the Deputy District Attorneys on Mr. Shortt's case, did not have access to any impeachment information including benefits provided to Cisneros prior to Mr. Shortt's conviction.

75.     Based on the Los Angeles County District Attorney's Office's failure to create a system in which information pertaining to jailhouse informants would be shared among Deputy District Attorneys, the routine use of jailhouse informants to obtain convictions, and the routine falsification of such testimony, Deputy District Attorneys for Defendant Los Angeles County and Defendant Los Angeles County had a pattern, practice, and custom rising to the level of policy of permitting jailhouse informants to testify falsely at trial that they were receiving little or no benefits for their testimony when, in truth and fact, these informants were receiving extensive benefits for their testimony. They were committing perjury through such testimony.

19

76.     Based on the Los Angeles County District Attorney's Office's failure to create a system in which information pertaining to jailhouse informants would be shared among Deputy District Attorneys, the routine use of jailhouse informants to obtain convictions, and the routine falsification of such testimony, Deputy District Attorneys for Defendant Los Angeles County and Defendant Los Angeles County had a pattern and practice of using unreliable testimony of jailhouse informants to secure criminal convictions, knowing that such testimony was false or made in reckless disregard to the falsity of the informant's testimony.

77.     During the time period at issue in this lawsuit, the Los Angeles District Attorney's Office had no established or clear policy regarding the following issues pertaining to informants: a) maintaining files and information regarding informants, and benefits offered to or received by informants in general, and jailhouse informants in particular; b) ensuring that information regarding benefits offered to or received by informants in general, and jailhouse informants in particular, was provided to the individual prosecutor(s) in the case(s) in which the informant was to testify; c) fully and completely documenting all law enforcement and prosecutorial interactions with informants in general, and jailhouse informants in particular; d) ensuring that the information and testimony provided by informants was reliable and truthful; e) ensuring that, whether through inadvertence or design, representatives of the State, including law enforcement and prosecutors, did not provide information to informants in a manner that suggested the provision of answers for which they were looking; f) disciplining employees involved in dishonesty or otherwise abusing their authority; g) investigating incidents involving the misuse of, or presentation of false evidence by, jailhouse informants or other misconduct by its employees; and h) supervising personnel in the provision of informant benefit and other relevant information to the defendant(s) in the case(s) in which the informant was to testify.

78.     To the extent that the Los Angeles District Attorney's Office had policies regarding the issues set out in the foregoing paragraph, the policies were not consistently known to, or implemented by, line prosecutors in cases in which an informant received benefits and testified in a case.

79.     During the time period at issue in this lawsuit, the Los Angeles District Attorney's Office had a custom and practice of a) not maintaining files and information regarding informants, and benefits offered to or received by informants in general, and jailhouse informants in particular; b) failing to ensure that information regarding benefits offered to or received by informants in general, and jailhouse informants in particular, was provided to the defendant(s) in the case(s) in which the informant was to testify; c) not fully and completely documenting all law enforcement and prosecutorial interactions with informants in general, and jailhouse informants in particular; d) failing to ensure that the information and testimony provided by informants was reliable and truthful; e) failing to ensure that, whether through inadvertence or design, representatives of the State, including law enforcement and prosecutors, did not provide information to informants in a manner that suggested the provision of answers for which they were looking; f) failing to discipline personnel involved in dishonesty or otherwise abusing their authority; g) failing to investigate incidents involving the misuse of, or presentation of false evidence by, jailhouse informants or other misconduct by its personnel; h) condoning and encouraging the fabrication of evidence, including but not limited to the presentation of materially false investigative reports, the use of perjurious jailhouse informants, and/or the use of false statements in their prosecutions; i) presenting and relying on false evidence against defendants without disclosing the falsity of the evidence; and, j) failing to properly or adequately supervise personnel in the provision of informant benefit and other relevant information to the defendant(s) in the case(s) in which the informant was to testify.

80.     The policies, practices and customs set forth above meant that certain exculpatory, material information either did not reach the prosecutors handling the cases regarding which the information was exculpatory, or such information was withheld by the prosecutors, and did not reach the defendants who needed the information in order to defend themselves, thereby depriving them of a fair trial. It was foreseeable that such policies, practices and customs would result in the deprivation of a fair trial, including specifically in Plaintiff Shortt's case. Such policies, practices and customs were a moving force or the moving force resulting in the deprivation of a fair trial to Plaintiff Shortt.

**G.      The Los Angeles County Sheriff'sOffice Had Policies, Customs and Practices That Resulted In the Presentation of False Informant Evidence and the Withholding of Exculpatory Evidence**

81.     The 1989-1990 Los Angeles County Grand Jury Investigation found widespread evidence that the Los Angeles Sheriff's Department was in the practice of using jailhouse informants to obtain false and fabricated confessions of criminal defendants. In its findings in the *Report of the 1989-1990 Los Angeles County Grand Jury In Its Investigation of the Involvement of Jail House Informants in the Criminal Justice System in the Los Angeles County*, the Grand Jury found that the Los Angeles County Sheriff's Department was aware of informants' ability to falsify confessions using information deliberately or inadvertently supplied to them by law enforcement officials. Even though the Sheriff's Department knew of this risk, it failed to take measures to prevent informants from obtaining confidential case information.

82.     Sheriff's deputies were often responsible for supplying informants with investigatory information, which enabled them to falsify confessions. Copies of arrest reports, case files, and photographs of victims were shown to informants. Sheriff's deputies removed informants from jail and drove them to the scene of the crime charged against the targeted defendant. Sheriff's deputies also orally

22

equipped informants with information necessary to falsify a defendant's confession. Sometimes deputies were less blatant when feeding informants facts about a case. As an example of the indirect method of furnishing information, after an informant denies hearing incriminating evidence, the deputy would then respond, "Don't you remember about", supplying critical facts about the particular case. The informant can then piece together enough details of the crime to fabricate a confession.

83.     According to the Grand Jury's report, Sheriff's Deputies had total discretion to place informants where they saw fit. There was at least some evidence that deputies intentionally placed informants with suspects from whom law enforcement could use a confession.

84.     Based on the Los Angeles County Sheriff's Department's routine use of jailhouse informants to obtain convictions, and the routine falsification of such testimony, Sheriff's Deputies for Defendant Los Angeles County and Defendant Los Angeles County Sheriff's Department had a pattern, practice, and custom rising to the level of policy of using unreliable testimony of jailhouse informants to secure criminal convictions, knowing that such testimony was false or made in reckless disregard to the falsity of the informant's testimony.

85.     During the time period at issue in this lawsuit, the Los Angeles Sheriff's Department had no established or clear policy regarding the following issues pertaining to informants: a) fully and completely documenting all law enforcement interactions with informants in general, and jailhouse informants in particular; b) ensuring that the information and testimony provided by informants was reliable and truthful; c) ensuring that, whether through inadvertence or design, representatives of the State, including law enforcement, did not provide information to informants in a manner that suggested the provision of answers for which they were looking; d) disciplining employees involved in dishonesty or otherwise abusing their authority; e) investigating incidents involving the misuse

of, or presentation of, false evidence by, jailhouse informants or other misconduct by its employees; f) supervising personnel in their interactions with jailhouse informants; and (g) properly and adequately training personnel responsible for interacting and interviewing jailhouse informants to ensure that information provided by informants was reliable and truthful.

86.     To the extent that the Los Angeles Sheriff's Department had policies regarding the issues set out in the foregoing paragraph, the policies were not consistently known to, or implemented by, sheriff's deputies in cases involving jailhouse informants.

87.     During the time period at issue in this lawsuit, the Los Angeles Sheriff's Department had a custom and practice of a) not maintaining files and information regarding informants, and benefits offered to or received by informants in general, and jailhouse informants in particular; b) failing to ensure that information regarding benefits offered to or received by informants in general, and jailhouse informants in particular, was provided to the prosecutors in the case(s) in which the informant was to testify; c) not fully and completely documenting all law enforcement interactions with informants in general, and jailhouse informants in particular; d) failing to ensure that the information and testimony provided by informants was reliable and truthful; e) failing to ensure that, whether through inadvertence or design, representatives of the State, including law enforcement, did not provide information to informants in a manner that suggested the provision of answers for which they were looking; f) failing to discipline personnel involved in dishonesty or otherwise abusing their authority; g) failing to investigate incidents involving the misuse of jailhouse informants or other misconduct by its personnel; h) condoning and encouraging the fabrication of evidence, including but not limited to the use of perjurious jailhouse informants, and/or the use of false statements in their prosecutions; i) presenting and relying on false evidence against defendants without disclosing the falsity of the evidence; j)

failing to properly or adequately supervise personnel in the provision of informant benefit and other relevant information to the defendant(s) in the case(s) in which the informant was to testify; and (k) failing to properly or adequately train personnel responsible for interviewing or otherwise interacting with jailhouse informants to ensure that the information provided was truthful and reliable.

88.     The policies, practices and customs set forth above meant that certain exculpatory, material information either did not reach the prosecutors handling the cases regarding which the information was exculpatory, or such information was withheld by the prosecutors, and did not reach the defendants who needed the information in order to defend themselves, thereby depriving them of a fair trial. It was foreseeable that such policies, practices and customs would result in the deprivation of a fair trial, including specifically in Plaintiff Shortt's case. Such policies, practices and customs were a moving force or the moving force resulting in the deprivation of a fair trial to Plaintiff Shortt.

## VI.
## PARTICIPATION, STATE OF MIND AND DAMAGES

89.     All Defendants acted illegally under color of law.

90.     Each Defendant participated in the violations alleged herein, or directed the violations alleged herein, or knew of the violations alleged herein and failed to act to prevent them. Each Defendant ratified, approved or acquiesced in the violations alleged herein.

91.     As joint actors with joint obligations, each Defendant was and is responsible for the failures and omissions of the other.

92.     Each Defendant acted individually and in concert with the other Defendants and others not named in violating Plaintiff's rights.

93.     Each Defendant acted deliberately, purposefully, knowingly and/or with a deliberate indifference to, or reckless disregard for, an accused's rights or for the truth in engaging in the conduct alleged herein.

94.     As a direct and proximate result of the aforesaid acts, omissions, customs, practices, policies and decisions of the Defendants, Plaintiff was wrongfully incarcerated for 28 years.  He has suffered great mental and physical pain, suffering, anguish, fright, anxiety, shock, humiliation, indignity, embarrassment, harm to reputation, and apprehension, which have caused Plaintiff to sustain damages in a sum to be determined at trial.

95.     Due to the acts of the Defendants, Plaintiff has suffered, and continues to suffer, and is likely to suffer in the future, extreme and severe mental anguish as well as mental and physical pain and injury. For such injury, Plaintiff will incur significant damages based on psychological and medical care.

96.     As a further result of the conduct of each of these Defendants, Plaintiff has lost past and future earnings in an amount to be determined according to proof at trial.

97.     As a further result of the conduct of each of these Defendants, Plaintiff has been deprived of familial relationships.

98.     The aforementioned acts of Defendants, and each of them, was willful, wanton, malicious, oppressive, in bad faith, engaged in knowingly and purposefully, and/or done with reckless disregard or with deliberate indifference to the constitutional rights of the Plaintiff and the truth.

99.     Plaintiff is entitled to exemplary and punitive damages from each Defendant other than Defendant County of Los Angeles in an amount to be proven at the trial of this matter.

100.   By reason of the above described acts and omissions of Defendants, Plaintiff was required to retain an attorney to institute and prosecute the within action, and to render legal assistance to Plaintiff that he might vindicate the loss and impairment of his rights, and by reason thereof, Plaintiff requests payment by Defendants of a reasonable sum for attorneys' fees pursuant to 42 U.S.C. §1988.

# VII.

## FIRST CLAIM FOR RELIEF

**DEPRIVATION OF CIVIL RIGHTS -- 42 U.S.C. §1983 – WRONGFUL CONVICTION RESULTING FROM FABRICATION OF EVIDENCE (Against Defendants Lamascus and Mercer)**

101.    Plaintiff re-alleges all the foregoing paragraphs, as well as any subsequent paragraphs contained in the complaint, as if fully set forth herein.

102.    Defendants Lamascus and Mercer, while acting under color of law, deprived Plaintiff of his due process rights by deliberately fabricating the false confession evidence offered by Stephen Cisneros, or by otherwise participating in the presentation of false evidence by him.

103.    One of two scanrios occurred regarding the interaction between Defendants Lamascus and Mercer and the prosecution regarding the foregoing fabricated evidence.

104.    Either Defendants Lamascus and Mercer forwarded the fabricated evidence to Deputy D.A. Tom Gray without advising him that Cisneros's testimony was fabricated, and had been fabricated with their assistance and at their direction, in which case Deputy D.A. Tom Gray did not exercise independent judgment sufficient to break the chain of causation resulting from the wrongful acts of individual Defendants Lamascus and Mercer.

105.    Or, in the alternative, Defendants Lamascus and Mercer fabricated the confession testimony with the knowledge and participation of prosecuting officials, including Deputy D.A. Tom Gray, in which case Deputy D.A. Tom Gray did not exercise independent judgment sufficient to break the chain of causation resulting from the wrongful acts of individual Defendants Lamascus and Mercer because Gray was a party to the false information.

106.    Acting under the color of state law, Defendants Lamascus, Mercer, and others acted in concert, conspiring and agreeing to deprive Plaintiff of rights, privileges, or immunities secured by the Constitution and laws of the United

States, in particular the right not to be convicted on the basis of deliberately fabricated evidence.

107. Criminal defendants have due process right not to be subjected to criminal charges or convicted on the basis of deliberately fabricated false evidence by the government. *Costanich v. Department of Social & Health Services,* 627 F.3d 1101 (9th Cir. 2010).

108. Defendants Lamascus and Mercer were each jointly and severally responsible for their actions in fabricating, or participating in the fabrication of, Cisneros' evidence. Each engaged in, knew, or should have known of the unconstitutional conduct alleged herein, and failed to prevent it, which each had a responsibility to do, and each ratified, approved or acquiesced in it.

109. As a result of Defendants', and each of their, violations of Mr. Shortt's rights as alleged herein, Mr. Shortt was damaged as alleged above.

## VIII.

## SECOND CLAIM FOR RELIEF

**DEPRIVATION OF CIVIL RIGHTS -- 42 U.S.C. §1983
(Against Defendant County of Los Angeles (County of Los Angeles District Attorney's Office and County of Los Angeles Sheriff's Department)) –
*MONELL* VIOLATIONS–FABRICATION OF EVIDENCE**

110. Plaintiff re-alleges all the foregoing paragraphs, as well as any subsequent paragraphs contained in the complaint, as if fully set forth herein. Plaintiff is informed and believes and thereon alleges that, at all times herein mentioned, Defendants County of Los Angeles, with deliberate indifference, and/or conscious or reckless disregard to the safety, security and constitutional and statutory rights of Plaintiff, including the right to due process of law under the Fourteenth Amendment, and with similar indifference to or disregard for the truth, maintained, enforced, tolerated, ratified, permitted, acquiesced in, and/or applied *inter alia*, the policies, practices and customs set forth above, including but not limited to those set forth in ¶¶75-80 as it related to the Los Angeles District

28

Attorney's Office and ¶¶ 81-88 as it related to the Los Angeles Sheriff's Department.

111.   The actions and inactions of the LASD set forth in the in the foregoing paragraphs were known, or should have been known to the policymakers responsible for the the Los Angeles County Sheriff's Department, and occurred with deliberate indifference to either the recurring constitutional violations elaborated above, and/or to the strong likelihood that constitutional rights would be violated as a result of failing to train, supervise or discipline in areas where the need for such training and supervision was obvious.

112.   The actions of the Los Angeles County District Attorney's Office and the Los Angeles County Sheriff's Department set forth herein were a motivating force behind the violations of Mr. Shortt's constitutional rights as set forth in this complaint.

113.   As a direct and proximate result of Defendant County of Los Angeles acts and omissions as alleged herein, Plaintiff Shortt was damaged as alleged above .

///
///
///
///
///
///
///
///
///
///
///
///

29

WHEREFORE, Plaintiff, James Darrell Shortt, requests relief on his own behalf as follows and, according to proof, against each Defendant:

1. General and compensatory damages in an amount according to proof;

2. Special damages in an amount according to proof;

3. Exemplary and Punitive damages against each Defendant, except the County of Los Angeles, in an amount according to proof;

4. Costs of suit, including attorneys' fees, under 42 U.S.C. §1988; and,

5. Such other relief as may be warranted or as is just and proper.

DATED: June 30, 2011          Respectfully Submitted,

LITT, ESTUAR, & KITSON LLP
LAW OFFICES OF GREGORY YATES

By _____
Barrett S. Litt
Attorneys for Plaintiff

## JURY DEMAND

Trial by jury of all issues is demanded.

DATED: June 30, 2011          Respectfully Submitted,

LITT, ESTUAR, & KITSON LLP
LAW OFFICES OF GREGORY YATES

By _____
Barrett S. Litt
Attorneys for Plaintiff

30